THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

POCONO MOUNTAIN          :
SCHOOL DISTRICT          :
                         :
            Plaintiff    :
                         :     3:15-CV-764
      v.                 :     (JUDGE MARIANI)
                         :
T.D., by and through     :
his Parent S.D.L.        :
                         :
            Defendant    :

## MEMORANDUM OPINION

### I. INTRODUCTION

Presently before the Court is a Report and Recommendation ("R&R") (Doc, 74) by

Magistrate Judge Carlson recommending granting the parties' cross-motions for judgment

on the administrative record in part and denying the motions in part, and affirming the

Hearing Officer's decision below in all respects. Docs. 42 and 54. Plaintiff Pocono

Mountain School District (the "District") filed Objections to the R&R, to which Defendant TD,

by and through his parent S.D.L., responded. Docs. 79, 83. The District also filed a reply to

TD's response. Doc. 84. For the reasons that follow, upon *de novo* review of the R&R, the

Court will adopt the R&R in part and overrule it in part.

### II. FACTUAL BACKGROUND

On April 20, 2015, the District initiated this action to appeal a decision issued by a

Pennsylvania Special Education Hearing Officer ("Hearing Officer") involving TD, a former

student of the District. Doc. 1. At the administrative level, the Hearing Officer, after receiving evidence and hearing testimony from the parties, made 146 findings of fact. Doc. 10-2 ¶¶ 1-146 (hereinafter "Fact Findings"). The Fact Findings detailed the series of efforts by the District and TD's parent to provide adequate education and related services to TD, who was diagnosed with conversion disorder and anxiety disorder.

Around the end of 2011 to the beginning of 2012, when TD was in the third grade, a female student touched TD's private parts on multiple occasions. *Id.* ¶¶ 1-2. After TD informed his mother of this, the mother notified the school. The school immediately conducted an investigation and determined that TD and the female student should be separated at all times for the rest of the school year. *Id.* ¶¶ 15, 19. For unknown reasons, the female student withdrew from the school the following week. *Id.* ¶ 20. For the few months after the investigation, TD exhibited behavioral and social issues, such as disciplinary notices and vision problems, though he maintained strong grades. *Id.* ¶¶ 22-28, 48. He also began seeing a consultant for victims of sexual abuse in the spring of 2012. *Id.* ¶ 25. In May 2012, the District conducted a meeting between District officials and TD's parent, during which the District's central office personnel opined that the school's initial investigation into the touching incidents did not comply with District protocol, but that they were confident that there were procedures in place to ensure TD's safety and a smooth transition into the fourth grade. *Id.* ¶¶ 36-38. The District also agreed to evaluate TD for

2

special education services; the evaluation report, issued in July 2012, concluded that he did not have a disability under IDEA. *Id.* ¶¶ 40, 47.

However, during TD's fourth grade year (fall of 2012 to spring of 2013), he continued to exhibit behavioral and social problems at school, such as an altercation with other students, frequent nurse visits and missing class time, and disrespectful behavior towards his teacher, as well as continued vision problems. *Id.* ¶¶ 51-56. In January of 2013, the Parent arranged for an independent neuropsychological evaluation to be conducted by Dr. Heather Hoover, who diagnosed TD with conversion disorder (based on his vision problems that lacked any physical or organic etiology), and anxiety disorder for the first time. *Id.* ¶¶ 60, 62, 81. The mother sent Dr. Hoover's report to the District, and the school met with the mother again in May 2013. *Id.* ¶¶ 92, 94. In the summer of 2013, a private school began contacting the District requesting TD's records, and the District dis-enrolled TD. However, after the mother requested yet another meeting with the District and informed the District that she had not yet decided if she were transferring TD into private school, the District re-enrolled TD. *Id.* ¶¶ 101, 107-08, 111. The mother ultimately decided to place TD in private school, where he attended fifth grade. *Id.* ¶¶ 113-15. In November 2013, the mother retained a private school psychologist to evaluate TD, who concluded that TD "appeared to be a student who qualified for services under the IDEA as a student with an emotional disturbance and who required special education/ related services" but recommended further evaluation. *Id.* ¶ 122. The mother shared this report with the District, which agreed to

conduct yet another independent evaluation at the District's expense. *Id.* ¶ 127. In May

2014, the independent evaluator retained by the District concluded that TD did not qualify as

"an eligible student under IDEA," but did find that he had a disability—namely, "conversion

disorder and anxiety disorder/not otherwise specified"—and that he qualified for Section 504

accommodations. *Id.* ¶ 129. The District agreed to implement and devise a Section 504

plan for TD, should he return to the District's schools. *Id.* ¶ 136. However, TD remained in

private school as of the time his mother filed the special education complaint that led to the

administrative proceedings. *Id.* ¶ 137.

Based on documentary evidence and witness testimony during the administrative

hearings, the Hearing Officer found that (1) TD was not eligible for a free and appropriate

public education ("FAPE") under the Individuals with Disabilities Education Act ("IDEA"), 20

U.S.C. § 1400 et seq., because he "does not qualify as a student with a disability under the

IDEA"; (2) but TD *was* disabled (due to his conversion disorder and anxiety disorder) under

Section 504 of the Rehabilitation Act of 1973, 20 U.S.C. § 794 ("Section 504"), and that he

was denied FAPE under Section 504 as of May 14, 2013, which entitled him to one hour of

compensatory education per school day for a period of 26 school days, as well as tuition

reimbursement for the 2013-14 and 2014-15 school years; and (3) the District demonstrated

deliberate indifference towards TD on the basis of his disability . Doc. 10-2 at 38-49

(hereinafter "Hearing Op.").

The parties filed cross-motions for judgment on the administrative record or, in the alternative, for summary judgment. Docs. 42 and 54. They agreed that they would not "seek to supplement the administrative recommend" and that their motions "shall be decided by the Court on the basis of the administrative record previously filed…in this action." Doc. 35 at 1-2. Neither party's motion clearly specifies the relief requested or what findings below they would ask this Court to affirm or overturn in their proposed orders. See Docs. 42-1, 54-1 (merely asking the Court to grant their respective motions for summary judgment, or in the alternative, judgment on the administrative record). The Court surmises from the parties' briefs that the District asks the Court to overturn the Hearing Officer's findings of disability, denial of FAPE, finding of deliberate indifference, and consequent compensatory education and tuition reimbursement damages under Section 504, and affirm the finding that TD is not disabled under IDEA, while TD requests the opposite relief, that is, affirming the Hearing Officer's findings as to the Section 504 analysis, and even extending the compensatory education "from the period March 2012 to May 14, 2013." Docs. 43, 54.[1]

---

[1] The District also perplexingly argues that the Hearing Officer impermissibly relied on the "poisoned waters" doctrine in granting an award of tuition reimbursement. Doc. 43, at 26-30. The R&R correctly found that the Hearing Officer's granted relief does not turn on the fact that the parties' failure to work together cooperatively, he merely opined, in a separate section of the decision, as to the parties' inability to "engage in a productive, mutually trusting/respectful relationship." Doc. 74 (quoting Doc. 10-2, at 48). There is no evidence that the Hearing Officer relied on this finding in granting tuition reimbursement.

The R&R also correctly denied TD's request to extend the period of compensatory education to begin on March 2013, instead of beginning on May 14, 2013. As the Hearing Officer found, though TD's conversion disorder and anxiety disorder had begun to emerge in the spring of 2012, the Parent did not immediately share Dr. Hoover's diagnoses with the District, thus, he determined the denial of FAPE began on May 14, 2013, when the District issued its evaluation report after having had an opportunity to review Dr. Hoover's report. Id. (citing Doc. 10-2, at 42.)

5

The parties' motions were referred to Magistrate Judge Carlson on September 25, 2017. After consideration of the parties' briefs and the record, Magistrate Judge Carlson issued the R&R, recommending that the parties' cross-motions each be granted in part and denied in part, and that the Hearing Officer's decision be affirmed in all respects.

The District objected to the R&R in a scattered brief, arguing that the R&R failed "to consider the record as a whole"; that it "merely incorporates the Hearing Officer's Decision without analysis necessary to this Appeal"; that it failed "to consider the extensive evidence and testimony provided by the District's 'educational professionals' greater expertise with educational matters'" (though the District fails to name who these "educational professionals" are or where their opinions can be found on the record); that it "proceeds by implication and is unclear as to the significance or relevance of its Statements [of Facts]"; that it conflates the legal standards under Section 504 and IDEA; that it "fails to address the hearing officer's application of the poisoned waters doctrine"; and that it unfairly dismissed the holding of *T.F. v. Fox Chapel Area School Dist.,* 589 Fed. Appx. 594, 598 (3d Cir. 2014). *See* Doc. 79 (hereinafter "Objections"), *generally*.

At the outset, the Court notes that the District's "Objections" do little to engage in a meaningful analysis of the R&R, but instead relies on either patently false statements (for example, claiming the Magistrate Judge failed to consider the "poisoned waters" argument and *T.F. v. Fox Chapel*'s holding when the R&R addressed both) or on empty rhetoric. *See e.g.,* Objections at 6 (stating "The objective of the R&R appears to be to get rid of this case,

6

not to deal with it" without citation or further analysis); *id.* at 3 (claiming that "[t]he R&R's

adoption of the Decision renders it tautological" and that "the failures of the R&R put the

District back to square one" without additional support or explanation); *id.* (stating that

instead of "having to make the same arguments by way of Objection to the R&R," the

District "incorporates by reference as if fully set forth herein the District's brief in support of

the Motion for Judgment on the Administrative Record, or, in the Alternative, for Summary

Judgment, dated April 25, 2016," even though incorporation of prior briefs is not permitted

under Local Rule 7.8)[2]; *id.* at 22 (arguing that the R&R "could be accused of the fairly

common fallacy of relating things in time and therefore in cause: *nunc pro tunc.* But things

related in time are not therefore related in cause...")[3]. The Objections also repeatedly

accuse the Magistrate Judge of failing to consider the oral argument transcript as evidence,

*id.*, at 2, 4-5, 26, despite the fact that oral argument is only a means for counsel to address

*what is already contained in the record*, not a conduit for the parties to introduce new

evidence. *See Jersey Cent. Power & Light Co. v. Lacey Twp.*, 772 F.2d 1103, 1109-10 (3d

---

[2] *See* Middle District of Pennsylvania Local Rule 7.8(a) ("No brief may incorporate by reference all or any portion of any other brief.").

[3] The Court is at a loss as to what the District is attempting to argue here. *"Nunc pro tunc* relief is 'an equitable power to grant an order now as if it were granted sometime in the past.'" *Jacobo v. Attorney Gen. of U.S.*, 459 F. App'x 112, 117 and 117 n. 7 (3d Cir. 2012) (quoting *Ramirez–Canales v. Mukasey*, 517 F.3d 904, 910 (6th Cir.2008)). The phrase is a legal term of art that refers to an order as having retroactive legal effect. The Court surmises that District counsel may have been referring to the *nunc pro tunc* fallacy as used in the study of history, but there, the fallacy stands for the mistaken idea that past events are "falsified by being defined or interpreted in terms of the consequent. Sometimes called the fallacy of *nunc pro tunc*..." Fischer, David Hackett, *Historians' Fallacies: Toward a Logic of Historical Thought*, at 135, New York: Harper Torchbooks, 1970. In other words, the *nunc pro tunc* fallacy outside the legal realm may refer to the practice of viewing past events through the lens of present perspectives. Neither definition of the fallacy stands for, as the District suggests, "things in time are not therefore related in cause." Objections at 22.

7

Cir. 1985) ("Legal memoranda and oral argument are not evidence and cannot by themselves create a factual dispute sufficient to defeat a summary judgment motion."), *cert. denied,* 475 U.S. 1013 (1986); *Orson, Inc. v. Miramax Film Corp.,* 79 F.3d 1358, 1372 (3d Cir. 1996) (same).

More bizarrely, the Objections include an email from a college professor criticizing the R&R's legal reasoning. Doc. 79 at 16. The Court is baffled by the inclusion of a *post hoc* opinion on the R&R's soundness from a person unrelated to this case. The inclusion of the email is not only irrelevant, but is also, as a general matter, highly inappropriate, as not even expert witnesses involved in the case are permitted to opine on the legal issues of the case. *See, e.g., Berckeley Inv. Grp., Ltd. v. Colkitt,* 455 F.3d 195, 217 (3d Cir. 2006) ("Although Federal Rule of Evidence 704 permits an expert witness to give expert testimony that 'embraces an ultimate issue to be decided by the trier of fact,' an expert witness is prohibited from rendering a legal opinion.") (citing *United States v. Leo,* 941 F.2d 181, 195–96 (3d Cir.1991)). Moreover, the email offers cursory statements with no citations to the record or the R&R. The Court will therefore disregard any arguments based on the third-party email.

Notwithstanding the above, upon *de novo* review of the R&R and a modified *de novo* review of the Hearing Officer's fact findings, the Court will overrule the R&R in part because the record does not support the Hearing Officer's findings of deliberate indifference by the

District, and because the Hearing Officer erred in determining TD to be disabled under

Section 504, but not disabled under IDEA.

## III. ANALYSIS

A district court may "designate a magistrate judge to conduct hearings, including

evidentiary hearings, and to submit to a judge of the court proposed findings of fact and

recommendations for the disposition" of certain matters pending before the court. 28 U.S.C.

§ 636(b)(1)(B). If a party timely and properly files a written objection to a Magistrate Judge's

Report & Recommendation, the District Court "shall make a *de novo* determination of those

portions of the report or specified proposed findings or recommendations to which objection

is made." *Id.* at § 636(b)(1); *see also Brown v. Astrue*, 649 F.3d 193, 195 (3d Cir. 2011);

Local Rule of the Middle District of Pennsylvania 72.3.

"When deciding an IDEA case, the District Court applies a modified version of *de*

*novo* review and is required to give due weight to the factual findings of the ALJ." *L.E. v.*

*Ramsey Bd. of Educ.*, 435 F.3d 384, 389 (3d Cir. 2006) (collecting cases). Under this

standard, "[f]actual findings from the administrative proceedings are to be considered *prima*

*facie* correct," and "[i]f a reviewing court fails to adhere to them, it is obliged to explain

why." *S.H. v. State–Operated School Dist. of City of Newark,* 336 F.3d 260, 271 (3d

Cir.2003) (citing *M.M. v. Sch. Dist. of Greenville County*, 303 F.3d 523, 530–31 (4th

Cir.2002)).[4] "In addition, if a state administrative agency has heard live testimony and has

found the testimony of one witness to be more worthy of belief than the contradictory

testimony of another witness, that determination is due special weight." *Shore Reg'l High*

*Sch. Bd. of Educ. v. P.S. ex rel. P.S.*, 381 F.3d 194, 199 (3d Cir. 2004) (internal citations

omitted). "Specifically, this means that a District Court must accept the state agency's

credibility determinations 'unless the non-testimonial, extrinsic evidence in the record

would *justify* a contrary conclusion.'" *Id.* (quoting *Carlisle Area School v. Scott P.*, 62 F.3d

520, 529 (3d Cir.1995)) (emphasis in original).

"The district court's review of the hearing officer's application of legal standards and

conclusions of law, on the other hand, is subject to plenary review." *Jana K. ex rel. Tim K.*

*v. Annville-Cleona Sch. Dist.*, 39 F. Supp. 3d 584, 594 (M.D. Pa. 2014) (citing *Warren G. v.*

*Cumberland Cnty. Sch. Dist.*, 190 F.3d 80, 83 (3d Cir.1999)). *See also M.S.-G v. Lenape*

*Reg'l High Sch. Dist. Bd. of Educ.*, 306 F. App'x 772, 773 n. 1 (3d Cir. 2009) ("Although the

District Court must employ a modified *de novo* review of the decisions of an administrative

fact finder, and we, in turn, review the District Court's factual findings for clear error, no such

deference is called for when the decisions of the ALJ and District Court involve only

questions of law.") (internal citations omitted).

---

[4] There appears to be no direct guidance on the standard of review applicable to claims under Section 504 as opposed to IDEA. The Third Circuit has declined to address the issue in a recent case involving a dispute over the applicable standards of review. *T.F. v. Fox Chapel Area Sch. Dist.*, 589 F. App'x 594, 598 (3d Cir. 2014). For purposes of this case, the Court notes that its holdings with respect to the Section 504 claim would remain the same under either the *de novo* standard or the modified *de novo* standard.

In the administrative proceeding below, TD's parent filed a special education complaint alleging that TD was eligible for special education services and accommodations under both IDEA and Section 504. IDEA imposes an affirmative duty for the school district to provide every disabled child with a "free appropriate public education," i.e. FAPE, 20 U.S.C. § 1412(a)(1), while Section 504 is a negative prohibition on discrimination against students based on their disabilities. Both Acts require a school to provide FAPE to disabled students and are often treated analogously. *M.R. v. Ridley Sch. Dist.*, 744 F.3d 112, 116 (3d Cir. 2014) ("§ 504's negative prohibition is similar to the IDEA's 'affirmative duty' and also requires schools that receive federal financial assistance to provide qualified students with a FAPE.").

Under IDEA, "[a] FAPE...includes both 'special education" and "related services.'" *Endrew F. ex rel. Joseph F. v. Douglas Cty. Sch. Dist.*, 137 S. Ct. 988, 994, 197 L. Ed. 2d 335 (2017) (quoting 20 U.S.C. § 1401(9)). "'Special education' is 'specially designed instruction ... to meet the unique needs of a child with a disability'; 'related services' are the support services 'required to assist a child ... to benefit from' that instruction." *Id.* (quoting 20 U.S.C. §§ 1401(26), (29)). Although a state is not required to maximize the potential of every handicapped child, it must supply an education that provides 'significant learning' and 'meaningful benefit' to the child." *Ridley Sch. Dist. v. M.R.*, 680 F.3d 260, 269 (3d Cir. 2012) (citing *D.S. v. Bayonne Bd. of Educ.*, 602 F.3d 553, 556 (3d Cir.2010)).

To prevail on a Section 504 claim, a plaintiff must establish that: "(1) he is 'disabled' as defined by the Act; (2) he is 'otherwise qualified' to participate in school activities; (3) the school or the board of education receives federal financial assistance; and (4) he was excluded from participation in, denied the benefits of, or subject to discrimination at, the school." *Ridgewood Bd. of Educ. v. N.E. ex rel. M.E.*, 172 F.3d 238, 253 (3d Cir. 1999). An individual is defined as having a "disability" if he or she has "(A) a physical or mental impairment that substantially limits one or more major life activities of such individual; (B) a record of such an impairment; or (C) [is] regarded as having such an impairment ...." 42 U.S.C. § 12102(1).

Due to the similar standards between IDEA and Section 504, "a party may use the same conduct as the basis for claims under both the IDEA and [Section 504] of the RA [i.e. Rehabilitation Act]." *Andrew M. v. Delaware Cty. Office of Mental Health & Mental Retardation,* 490 F.3d 337, 349 (3d Cir. 2007). *See also P.P. ex rel. Michael P. v. W. Chester Area Sch. Dist.*, 585 F.3d 727, 735 (3d Cir. 2009) ("The IDEA and § 504 of the Rehabilitation Act do similar statutory work....Section 504 of the Rehabilitation Act is parallel to the IDEA in its protection of disabled students: it protects the rights of disabled children by prohibiting discrimination against students on the basis of disability, and it has child find, evaluation, and FAPE requirements, like the IDEA."); *D.K. v. Abington Sch. Dist.*, 696 F.3d 233, 253 (3d Cir. 2012) ("As under the IDEA, providing a FAPE in accordance with § 504 requires a school district to reasonably accommodate the needs of the handicapped child so

12

as to ensure meaningful participation in educational activities and meaningful access to educational benefits. Consequently, our finding that the School District did not deny D.K. a FAPE is equally dispositive of Plaintiffs' § 504 claim.") (internal quotation marks omitted). However, this does not mean "that a violation of the IDEA is a *per se* violation of [Section 504 of] the RA ... even in cases also brought under the IDEA ... a plaintiff must still prove that there was a violation of [Section 504 of] the RA." *Andrew M.*, 490 F.3d at 349 (internal citation omitted).

## A. The Hearing Officer Erred in Awarding Compensatory Damages Under Section 504 Because the Record Does Not Support a Finding of Deliberate Indifference

Based on his finding that TD was deprived of FAPE under Section 504, the Hearing Officer awarded an hour of compensatory education for every school day from May 14, 2013 to the end of that school year. Hearing Op. at 42-43. He separately awarded the parent tuition reimbursement for school years 2013-2014 and 2014-2015 "as a result of the District's denial of FAPE to [TD] under Section 504/Chapter 15 [i.e. Pennsylvania Code's regulation implementing Section 504]." *Id.* at 46. Before awarding compensatory damages under Section 504 however, there must be a finding of deliberate indifference on the part of the school district. *S.H. Ex rel. Durrell v. Lower Marion School District*, 729 F.3d 248, 262-63 (3d Cir. 2013). *See also Fox Chapel*, 589 F. App'x at 599 ("To recover compensatory damages under Section 504, Appellants must establish intentional discrimination.") (quoting *S.H.*, 729 F.3d at 262).

In their motion for judgment on the administrative record, the District argued that tuition reimbursement under Section 504 is a form of compensatory damages and therefore requires a showing of deliberate indifference. Doc. 43, at 24-26. However, TD's counsel argues that no such showing is required because tuition reimbursement is equitable relief, not compensatory damages. TD's brief cited two Supreme Court cases from 1985 and 1993, both of which addressed only appropriate remedies under IDEA, not Section 504. *See Sch. Comm. of Town of Burlington, Mass. v. Dep't of Educ. of Mass.*, 471 U.S. 359, 374, 105 S. Ct. 1996, 2005, 85 L. Ed. 2d 385 (1985) and *Florence County School Dist. Four v. Carter*, 510 U.S. 7, 114 S.Ct. 361, 126 L.Ed.2d 284 (1993). *See also Forest Grove Sch. Dist. v. T.A.*, 557 U.S. 230, 238, 129 S. Ct. 2484, 2491, 174 L. Ed. 2d 168 (2009) (noting that *Burlington* and *Carter* held that IDEA authorizes courts to award parents reimbursement costs for special education costs).

In at least two recent (albeit non-precedential) opinions, the Third Circuit squarely addressed the question of whether tuition reimbursement constituted compensatory damages under Section 504 and answered in the affirmative. *See Fox Chapel*, 589 F. App'x at 599 (in the context of discussing Section 504, noting that "[t]o recover compensatory damages under Section 504, Appellants must establish intentional discrimination…in an effort to avoid the heightened burden of proof for compensatory damages, Appellants contend that tuition reimbursement is an equitable remedy. We are not persuaded by this argument. It is hard to imagine what would constitute compensatory

damages in these circumstances if not tuition reimbursement...As such, we agree with the District Court's application of the higher intentional-discrimination standard."); *Sch. Dist. of Philadelphia v. Kirsch*, 722 F. App'x 215, 228 (3d Cir. 2018) (in the context of ADA an Section 504 claims, noting that the "Parents fail to articulate why reimbursement for money they have paid constitutes equitable relief rather than compensatory damages. In essence, tuition reimbursement compensates parents for education expenses. Thus it is properly classified as compensatory damage relief.").

In an attempt to extend equitable authority for tuition reimbursement to Section 504, TD's brief cites only nonbinding district court cases that touch on the possibility of reimbursement under both IDEA and Section 504 without finding deliberate indifference. *See* Doc. 55 at 18 (citing *Lauren G. v. West Chester Area School Dist.*, 906 F. Supp. 2d 375 (E.D. Pa. 2012); *Molly L. v. Lower Merion School Dist.*, 194 F. Supp. 2d 422 (E.D. Pa. 2002);[5] *Kevin M. v. Bristol Twp. School Dist.*, 2002 WL 73233 (E.D. Pa. Jan. 16, 2002); *Borough of Palmyra., Bd. Of Educ. v. F.C.*, 2 F. Supp. 2d 637 (D.N.J. 1998)). Not only are these cases not binding on this Court, they were also decided before *Fox Chapel* and *Kirsch*, the latter of which was issued this year. Thus, the Court will follow the Third Circuit's recent guidance that tuition reimbursement is properly categorized as compensatory damages under Section 504. Accordingly, tuition reimbursement can only be awarded under Section 504 if the District has demonstrated deliberate indifference.

---

[5] In fact, *Molly L.* found that no reimbursement relief was warranted in that case since the district provided adequate accommodations for the student. *Molly L.*, 194 F. Supp. 2d at 437.

To establish deliberate indifference, the evidence must show both "knowledge that a federally protected right is substantially likely to be violated" and "failure to act despite that knowledge." *S.H.*, 729 F.3d at 265 (citing *Duvall v. Cnty. of Kitsap*, 260 F.3d 1124, 1139 (9th Cir.2001)). The Third Circuit has said that "evidence that the School District *may have* been wrong about [the student's] diagnosis is not evidence that the School District had knowledge that it was a wrong diagnosis. Nor does evidence that the School District's evaluation processes were defective bear on our analysis." *Id.* (emphasis added). "Deliberate indifference requires *actual knowledge*; allegations that one would have or 'should have known' will not satisfy the knowledge prong of deliberate indifference." *Id.* at 265 n. 26 (quoting *Bistrian v. Levi*, 696 F.3d 352, 367 (3d Cir.2012)). While it does not require "a showing of personal ill will or animosity toward the disabled person," it does require a "deliberate choice, rather than negligence or bureaucratic inaction." *A.G. v. Lower Merion Sch. Dist.*, 542 F. App'x 194, 199 (3d Cir. 2013) (quoting *S.H.*, 729 F.3d at 263).

In *S.H.*, the Third Circuit found that the school district did not show deliberate indifference in misdiagnosing a student as disabled, even though the student "expressed unhappiness at being designated disabled" and being placed in special education. *S.H.*, 729 F.3d at 266. The Court found that these complaints "put the School District on notice of nothing more than the fact that S.H. did not like being in special education classes" and that "[m]ore importantly, [the parent] continued to approve her placement in special education." *Id.* The Court also found "S.H.'s test scores and good grades in school" were not sufficient

16

to "put the School District on notice that she did not have a learning disability," because while "S.H. performed well in some areas on various tests throughout her educational career, she performed below average in other areas." *Id.* at 266-67. Finally, the Court stated that misdiagnoses did not amount to deliberate indifference, as "[t]he relevant inquiry is knowledge, and evidence that the School District may have been wrong about S.H.'s diagnosis is not evidence that the School District had knowledge that it was a wrong diagnosis." *Id.* at 266.

In *A.G.*, the Third Circuit reiterated that deliberate indifference required a "deliberate choice, rather than negligence or bureaucratic inaction." *A.G.*, 542 F. App'x at 198-99 (quoting *S.H.*, 729 F.3d at 263). There, the parents also argued that the district was deliberately indifferent in misdiagnosing their child as a special education student when she should have received regular education. The Court disagreed, noting that plaintiff's "allegations that [the school district] may have been wrong about A.G.'s diagnosis and arguments that [the school district's] evaluation process was defective does not prove that [the school district] had knowledge that it made the wrong diagnosis." *A.G.*, 542 F. App'x at 200. The Court also found that although the school psychologist's "classification of A.G. as OHI [i.e. Other Health Impairment under IDEA] may have been in technical noncompliance with the IDEA, that fact alone does not provide a basis for a claim under § 504 or the ADA." *Id.* at 201.

In *Fox Chapel*, the Third Circuit again found no deliberate indifference, noting that the record "establishes that Fox Chapel accepted T.F.'s food allergy and worked diligently with his parents to ensure his meaningful participation in educational activities and meaningful access to educational benefits," including meeting with the parents on numerous occasions and forming Section 504 plans. *Fox Chapel*, 589 F. App'x at 601. In so holding, the Court noted that "[t]he fact that Fox Chapel did not include every accommodation that T.F.'s parents requested does not constitute a failure to act." *Id.*

Finally, in *D.E. v. Cent. Dauphin Sch. Dist.*, the Third Circuit rejected the plaintiff's argument that the school district "ignored" an external medical provider's evaluation and recommendations, and found that "although [the school district] did not conduct the exact tests recommended by [the external medical provider], it did indeed administer additional testing...the results of which it incorporated with [the medical provider's] test results into the new [evaluation report]." 765 F.3d 260, 270 (3d Cir. 2014). Thus, the plaintiff's "arguments demonstrate, at best, possible defective evaluation processes, which, of course, have no bearing on the question of knowledge." *Id.* Furthermore, plaintiff's arguments that the school incorrectly designated the student as mentally disabled and that the school delayed evaluation of the student are not sufficient, as "[b]oth allegations are premised upon what Central Dauphin should have known rather than what it actually knew." *Id.* Additionally, the Court noted that there were "concerns raised by a few of [the student's] teachers regarding his performance and placement," that is not sufficient to show deliberate indifference, as

"there [were] several instances in the record in which D.E.'s parents approved of his IEPs and subsequent placements" and "only one instance in which D.E.'s parents disapproved of his placement and classification," after which the school apologized to the parents and corrected its error. *Id.* On these facts, the Third Circuit affirmed the district court's finding that there was no deliberate indifference. *Id.* at 270-71.

The cumulative cases cited above demonstrate that deliberate indifference is a high standard in the context of education cases. Where the record demonstrates only "negligence or bureaucratic inaction," a deliberately indifference finding cannot stand. *A.G.*, 542 F. App'x at 199. In his opinion, the Hearing Officer concluded that a finding of deliberate indifference was warranted based on four factors:

- The January 2012 investigation of the inappropriate touching did not follow District procedures or protocols for handling such reports;
- [I]n February 2013, instead of cooperating with the request of the neuropsychiatrist for an adaptive behavior assessment, the District substituted its own views on the assessment and dissuaded the student's mother from pursuing such a request through the District;
- [T]he persistent pre-determination stance over April-August 2013 that the student did not have a disability and did not qualify for support under Section 504, where the District would collaborate with the student's mother regarding the Section 504/Chapter 15 process and, contemporaneously, share internal communications regarding the District's position that the student would not be receiving services; and
- [T]he secretive, unilateral disenrollment of the student from the District in the summer of 2013.

  Accordingly, the order for this decision will include a finding that the District was deliberately indifferent to the needs of the student and discriminated against the student on the basis of disability.

Hearing Op. at 47-48. Though this Court accords deference to the Hearing Officer's underlying factual findings, it does not agree with the legal conclusion that these four sets of circumstances meet the high standard of deliberate indifference. First, while the District's superintendent told TD's mother that the school's January 2012 investigation of the inappropriate touching "were not handled according to District procedures/ protocols for such reports," it is undisputed that the school immediately conducted an investigation the day after the mother notified the school and sought to separate TD from the female student accused of inappropriate touching. Fact Findings ¶¶ 12-13, 15, 19, 36. The superintendent also noted that while the investigation was not strictly compliant with District protocols, he "expressed confidence in[] the District's student safety and anti-bullying programming," stated that he would ensure that TD would continue to check in with the school counselor, and declared that "efforts would be coordinated with 4th grade teachers and [the] school counselor for a smooth transition to 4th grade." Id. ¶¶ 36-38. The fact that the school's investigation did not strictly comply with protocols does not rise to the level of deliberate indifference, especially since the school conducted an investigation the day after TD's mother reported the incident and separated the students. Id. ¶¶ 13, 15, 19.

As for the second basis for deliberate indifference, it is true that in February 2013, Dr. Hoover asked TD's mother to request an adaptive behavior assessment, which the District declined to perform, opting instead for a records-only review. Id. ¶¶ 69, 71. However, in an internal email, the school psychologist, who had been communicating with

TD's mother, noted that she will explain to TD's mother that "adaptive rating scales are done for the reason of evaluating for an intellectual disability. [The assistant superintendent of special education services] suggested that if [the mother] still insists on having adaptive looked at – we will just include it." *Id.* ¶ 72 (quoting P-35 at 17-18). Thus, the District declined to perform the adaptive behavior assessment because it viewed the assessment as inappropriate for TD, who exhibited no signs of intellectual disabilities. Further, there is nothing in the record to indicate that the school psychologist failed to explain the District's reason for not performing an adaptive behavior assessment to TD's mother, as she indicated she would in the email, nor anything in the record indicating that TD's mother objected to the District's explanation and insisted on an adaptive behavior assessment anyway.

As for the third basis for deliberate indifference, the Hearing Officer's characterization of the District's "persistent pre-determination stance" that TD did not have a disability is overstated. The only evidence of "pre-determination" cited by the Hearing Officer is an internal District email from April 2013, sent prior to the District's awareness of Dr. Hoover's formal diagnoses of TD's conversion and anxiety disorders. In the email, the assistant superintendent of special education services stated that "it does not appear [TD] will meet the eligibility criteria" under IDEA and that TD's "disorder is not substantially limiting a major life activity." Fact Finding ¶ 87 (quoting P-35 at 43). However, put in

greater context, the email clearly states that the District will refrain from making a final

decision until it has a chance to review Dr. Hoover's report:

1. Thursday I met with Anastasia, Jane Dial, and Susie.
2. A PTE has been secured for a Review of Records only. Conversion Disorder is a DSM-IV diagnosis. Susie is going to secure the evaluation report [by Dr. Hoover] from mom...
3. Susie will review and draft an addendum to the [evaluation report] that Gail Brown completed that did not identify [TD] as eligible for special education services. This was done in the summer of 2012. The decision will be a team decision, as required by law, for determination of a disability. However based on what Susie has reviewed to date, it does not appear [TD] will meet the eligibility criteria.
4. If he does not qualify under Chapter 14 [we] will conduct a Section 504 evaluation. However, at this point his disorder is not substantially limiting a major life activity.

...

Susie explained the process to [TD's mom] and how we need to meet to go over the data and reports, etc. and as a team, we will determine eligibility...

Doc. 14-3 at 43. Thus, far from rendering a pre-determination, the email reveals that

the District had not yet received Dr. Hoover's report, that at least one other psychologist did

not identify TD as eligible for special education services, that the ultimate decision for

determination of disability "will be a team decision," and that the District will meet with TD's

mother to "determine eligibility" after going over the reports together. This can hardly be

qualified as a deliberate, preordained position that TD is in fact not disabled. Furthermore,

the idea that the District had a "pre-determined," fixed position is undermined by the fact

that the District later offered TD Section 504 accommodations, based on an independent

evaluator's determination that TD qualified as a disabled student under Section 504. Fact Findings ¶¶ 129, 136.

The Hearing Officer's fourth basis for finding deliberate indifference is the "secretive, unilateral disenrollment of the student from the District in the summer of 2013." Hearing Op. at 48. This is hardly a reasonable characterization. The misunderstandings over TD's enrollment started on June 2, 2013, when "the District received a request for records from the private school" where TD was ultimately enrolled. Fact Finding ¶ 101. "On June 20, 2013, the private school contacted the District a second time for the student's records." *Id.* ¶ 107. Around 10 days later, an internal District email showed that "a request for the student's records had been received from the private placement and the records had been sent." *Id.* ¶ 108 (citing P-35 at page 81). Thus, the District dis-enrolled TD "[a]t some point in the summer of 2013," presumably because school officials believed that TD would be attending private school in the upcoming school year. *Id.* ¶ 109. On August 12, 2013, after TD's mother asked for another meeting with the District, the assistant principal asked the mother "if, given the records request from the private placement, the student was returning to the District." *Id.* ¶ 110. TD's mother "responded that the records request was a necessary precursor to potential enrollment and that she was undecided about enrolling [TD]." *Id.* The same day, "after receiving the email from [TD's] mother, the assistant principal emailed the director of special education indicating that the student would be added back to the District's rolls." *Id.* ¶ 111. Thus, TD's dis-enrollment and re-enrollment in

the summer of 2013 at most amounted to crossed communications and bureaucratic blunders. Given that the District only dis-enrolled TD after receiving requests for records from the private school, and that it immediately re-enrolled TD after his mother's clarification, there is little support for the inference that the dis-enrollment was borne out of intentional discrimination against TD's disability.

In sum, none of the four bases for deliberate indifference identified by the Hearing Officer satisfies the high standard set forth by Third Circuit case law. At most, these bases reveal mere negligence on the part of the District, not "actual knowledge" that TD's federally protected rights would be substantially likely violated. *Compare S.H.*, 729 F.3d at 265 n. 26 ("Deliberate indifference requires *actual knowledge*; allegations that one would have or 'should have known' will not satisfy the knowledge prong of deliberate indifference.") *with* Hearing Op. at 42 (citing the legal standard as "where a school district has denied FAPE to a student, the student is entitled to compensatory education from a point where the school district *knew or should have known* that the student was being denied FAPE") (emphasis added).

As discussed above, a finding of deliberate indifference is required before tuition reimbursement may be awarded under Section 504. *See Fox Chapel*, 589 F. App'x at 599 ("It is hard to imagine what would constitute compensatory damages in these circumstances if not tuition reimbursement."); *Kirsch*, 722 F. Appx at 228 (noting that tuition reimbursement "is properly classified as compensatory damage relief."). Thus, the Hearing Officer erred in

24

awarding tuition reimbursement under Section 504. Hearing Op. 43-46 (finding that parent is entitled to tuition reimbursement under its Section 504 analysis). In fact, instead of analyzing tuition reimbursement as compensatory damages under Section 504, the Hearing Officer used a standard commonly used in IDEA cases to determine whether TD was entitled to tuition reimbursement. *Id.* at 43 (under the Section 504 section, stating that "[a] claim for tuition reimbursement for a denial of FAPE under IDEA/Chapter 14 is gauged through a three-step analysis, commonly referred to as a *Burlington-Carter* analysis, which has been incorporated into IDEA and Chapter 14. A similar analysis will be utilized to gauge parent's claim in this case") (internal citations omitted). Thus, to the extent tuition reimbursement was awarded as compensatory damages under Section 504, that conclusion is vacated. However, because the Court finds that TD is disabled under both IDEA and Section 504 based on the fact findings of the Hearing Officer, *infra*, TD's parent will be separately entitled to tuition reimbursement under IDEA.

## B. Giving Due Weight to the Hearing Officer's Fact Findings on TD's Disability, TD Qualifies as A Disabled Student Under Both IDEA and Section 504

In this case, the Hearing Officer found that TD "does not qualify as a student with a disability under the IDEA" because he did "not require special education to make progress in the educational environment," but that he *does* qualify "as a student with a disability (here, conversion disorder and anxiety disorder/ not otherwise specified)" under Section 504. Doc. 10-2 at 38, 40. The R&R affirmed these seemingly inconsistent findings by holding that a finding of disability under Section 504 is warranted because while "TD

25

maintained relatively consistent grades throughout this year-and-a-half period, TD's ability to obtain passing grades is not dispositive of whether his conversion disorder and anxiety disorder substantially limited his education," and that the District performed an inadequate evaluation of TD by "overemphasiz[ing] [TD's] academic proficiency while neglecting to consider behavioral issues or other suspected areas of disability." R&R at 32, 37-38 (citing *G.D. v. Wissahickon Sch. Dist.*, 832 F. Supp. 2d 455, 465–67 (E.D. Pa. 2011)).

But when affirming TD's *lack of* disability under IDEA, the R&R cites the same evidence of TD's strong grades as support that he is not disabled under IDEA. *See id.* at 44 (affirming the Hearing Officer's conclusion under IDEA because "although TD had been diagnosed with conversion disorder and anxiety disorder, he continued to make solid academic progress and therefore did not require specialized educational instruction," and noting that "[a] student's academic performance is a crucial factor in the determination of whether a student requires 'special education' and therefore may be deemed a 'child with a disability' under the IDEA.") (citing again to *G.D. v. Wissahickon Sch. Dist.*, 832 F. Supp. 2d 455, 465–67 (E.D. Pa. 2011)).

Here, neither the parties nor the Hearing Officer disputes that TD received satisfactory grades. *See* Doc. 42-2 ¶¶ 18, 19, 23, 34, 59 (admitted facts showing that TD received As and Bs in 2012 and 2013, and that he was a member of the student government during fourth grade). However, TD's problems are not academic in nature, but rather, behavioral and social. Around the end of 2011 to the beginning of 2012, TD reported

that a female student (also in the third grade) touched his private parts on several occasions. Fact Finding ¶ 5. Around that same time period, he began exhibiting defiant behavior in school and at home. *Id.* ¶¶ 6-7. In the following few months, TD developed disciplinary issues as well as vision problems. *Id.* ¶ 22-28. In the fall of that year, TD's behavioral issues continued in the form of frequent visits to the school nurse, disrespect towards his teacher, detention for incomplete homework, and an altercation with other students on the school bus. *Id.* ¶¶ 51-55. In 2013, TD's parent arranged for a neuropsychological evaluation by Dr. Heather Hoover, who formally diagnosed TD as having conversion disorder and anxiety disorder for the first time. *Id.* ¶ 81 (citing P-26).

Dr. Hoover's diagnoses were based on TD's "somatic symptoms (specifically, visual complaints) without any identified organic etiology to date by brain MRI or other medical exams," and the fact that while TD "does not meet criteria for any clinical anxiety disorder... his symptoms of anxiety should not be dismissed as he does have elevated anxiety. As such, Anxiety Disorder Not Otherwise Specified (NOS) is diagnosed." Doc. 14-2 at 101. Dr. Hoover noted that regardless of whether the inappropriate touching constituted clinical sexual abuse, the after-effects of the incidents were sufficient to manifest real symptoms in TD:

> [TD's mother] indicates there were some instances of a female peer touching [TD] in the genitalia during school last year, *there is no evidence that he is a victim of actual abuse as legally defined* (including [the fact that there is] no perpetrator of age to meet the legal definition). This is not to minimize a potentially difficult event or event(s) but rather to make clear that there is no issue here of mandated report to Children and Youth Services (CYS). No

27

concerns about any recent events, *but relevant to note here is that mother and sexual assault advocate ("healing coach") working with him report the timing of the inappropriate touching coincided with the onset of his visual complaints – which may have served the function of avoiding or escaping some situations/person/location.*

Doc. 14-2 at 84 (emphasis added). Thus, while offering no opinion on the sexual trauma TD may or may not have suffered from the inappropriate touching, Dr. Hoover did draw a connection between the touching and TD's vision problems. This connection appeared to contribute to her diagnosis of conversion disorder. It is on the basis of Dr. Hoover's diagnoses that the Hearing Officer found TD to be disabled within the meaning of Section 504. Doc. 10-2 at 40 ("Here, the student clearly qualifies as a student with a disability (here, conversion disorder and anxiety disorder/not otherwise specified) who requires accommodations in the educational environment as the result of those disabilities.").

On appeal, the District argued that TD should not be found as disabled under Section 504 "based on only on [sic] the diagnoses of conversion disorder and anxiety disorder," emphasizing that Dr. Hoover "specifically deferred to the educational team [of the District] any determination of eligibility under Section 504." Doc. 43 at 16.[6] The District, after receiving Dr. Hoover's report, determined with TD's mother that TD did not require an IEP under IDEA. Fact Finding ¶ 93. However, Dr. Hoover's deference to the school on the

---

[6] In support, the District cites, inexplicably, to Doc. 50, which is a motion to exceed page limits. In general, neither party correctly cited to the administrative record as it appeared in the court's docket, resulting in the Court having to conduct its own time-consuming review of the record. The Court has done so given the significance of the parties' interests, but notes that counsel's filings have done little to further their clients' interests.

question of eligibility does not mean the Court should take the District's word that at this time, TD was not eligible for federal statutory protections. According to the Hearing Officer's fact findings, not only was TD diagnosed with these disorders, but concomitant symptoms had began to manifest in school as early as spring of 2012, leading to a negative impact on his education. *See, e.g.,* Fact Findings ¶¶ 22, 34, 51-58 (noting that as early as February to March of 2012, TD received several disciplinary notices; that in April 2012, the school met with TD's mother and TD's counselor and discussed not only the inappropriate touching, but also "reports of the changes in [TD's] behavior, [his] negativity toward school, and [his] vision complaints"; and that TD's his vision problems and behavioral issues continued, and in some respects worsened, in fall of 2012 to 2013, including frequent nurse visits, an altercation with other students, assignment incompletion, and disrespectful behavior towards his teacher).

In addition, the Hearing Officer accorded "heavy weight" to the testimony of TD's mother and the independent evaluator who reviewed TD's records in 2014. Doc. 10-2 at 37. The independent evaluator, who conducted a review of TD's records in 2014, concluded that while TD "did not qualify as an eligible student under IDEA," he "is a child with a disability (i.e., Conversion Disorder and Anxiety Disorder/Not Otherwise Specified)" and "it is clear that [TD] qualifies for a Section 504 Accommodation Plan based on [his] diagnoses and requires accommodations." Fact Finding ¶ 130 (citing P-69 at 33). Because this Court should "due special weight" to the Hearing Officer's credibility findings as he "has heard live

testimony and has found the testimony of one witness to be more worthy of belief than the contradictory testimony of another witness," the Court will accept the Hearing Officer's credibility determinations as to the independent evaluator's testimony. *Shore Reg'l High Sch.*, 381 F.3d at 199.

According due weight to the Hearing Officer's fact findings and credibility determinations, the Court finds no reason to disturb the findings that TD suffered from conversion disorder and anxiety disorder and that TD had exhibited attendant behavioral issues and vision problems at school. However, this Court is not obligated to give deference to the Hearing Officer's *legal* conclusion that TD is disabled under Section 504, but *not* disabled under IDEA. *See G.H. v. Great Valley Sch. Dist.*, 2013 WL 2156011, at *5 (E.D. Pa. May 20, 2013) (noting that "[t]he Second and Eighth Circuits have held that the issue of whether a particular student satisfies the definition of 'emotionally disturbed'" as defined under IDEA "should be reviewed *de novo*" and that "[o]n a motion for judgment on the administrative record, the relevant facts as to behavior and performance are not in dispute; thus, the district court [is] as well-positioned as the state administrative officials to determine [the student's] eligibility...[which] is a matter of statutory interpretation, a question of law") (citing *Muller v. Comm. on Special Educ.*, 145 F.3d 95, 102 (2d Cir.1997) and *J.H. v. Republic R–III Sch. Dist.*, 632 F.3d 1024, 1026 (8th Cir.2011)).

In his opinion, the Hearing Officer devoted little analysis to the issue of disability under IDEA—concluding cursorily that TD "does not qualify as a student with a disability

under the IDEA" because he did "not require special education to make progress in the educational environment" and that "at no time[] has the student required special education as the result the diagnosed disability." Hearing Op. at 38. Thus, the Hearing Officer appears to foreclose the possibility that TD is disabled IDEA because he did not require special education classes. But IDEA does not only encompass "special education" instruction; it also covers any "related services." 20 U.S.C. § 1400(d) ("The purposes of this chapter are...to ensure that all children with disabilities have available to them a free appropriate public education that emphasizes *special education and related services* designed to meet their unique needs..."); *Fry v. Napoleon Cmty. Sch.*, 137 S. Ct. 743, 748–49, 197 L. Ed. 2d 46 (2017) ("As defined in [IDEA], a FAPE Comprises 'special education and related services'—*both* 'instruction' tailored to meet a child's 'unique needs' *and* sufficient 'supportive services' to permit the child to benefit from that instruction.") (quoting 20 U.S.C. §§ 1401(9), (26), (29)) (emphasis added). "'[R]elated services' are the support services 'required to assist a child... to benefit from that instruction." *Endrew F.*, 137 S. Ct. at 994 (quoting 20 U.S.C. §§ 1401(26)).

In other words, "special education and related services" not only includes academic instruction, but also services that address the behavioral and emotional needs of the student. In fact, "a child with a disability" can be defined as having "emotional disturbance" under IDEA. 20 U.S.C. 1401(3)(A) ("The term 'child with a disability' means a child (i) with intellectual disabilities...visual impairments (including blindness), serious emotional

disturbance (referred to in this chapter as "emotional disturbance")...; and (ii) who, by reason thereof, needs special education and related services."). The regulation implementing IDEA defines "emotional disturbance" in a broad manner:

> Emotional disturbance means a condition exhibiting one or more of the following characteristics over a long period of time and to a marked degree that adversely affects a child's educational performance:
>
>> (A) An inability to learn that cannot be explained by intellectual, sensory, or health factors.
>> (B) *An inability to build or maintain satisfactory interpersonal relationships with peers and teachers.*
>> (C) *Inappropriate types of behavior or feelings under normal circumstances.*
>> (D) A general pervasive mood of unhappiness or depression.
>> (E) *A tendency to develop physical symptoms or fears associated with personal or school problems.*

34 C.F.R. § 300.8(c)(4) (emphasis added). In other words, IDEA affords an expansive definition of what may constitute an emotional disturbance disability. Indeed, many courts have found that students with behavioral or emotional issues are entitled to FAPE under IDEA. *See, e.g., A.W. ex rel. H.W. v. Middletown Area Sch. Dist.*, 2015 WL 390864, at *14 (M.D. Pa. Jan. 28, 2015) (reversing the Hearing Officer's decision and holding that the student was denied FAPE under IDEA when she suffered from a diagnosed anxiety disorder, worsening academic performance, and absences from school.); *T.M. v. Quakertown Cmty. Sch. Dist.*, 251 F. Supp. 3d 792, 806–08 (E.D. Pa. 2017) (finding the school district provided adequate FAPE under IDEA to address autistic student's behavioral issues by implementing "coping mechanisms" such as "taking a break to bounce on a

therapy ball...after he has become upset or frustrated," collecting data as to the student's ability to remain calm, and modifying the strategies in response to the student's progress and his parent's requests.) (internal citation omitted); *J.Q. v. Washington Twp. Sch. Dist.*, 92 F. Supp. 3d 241, 247 and 247 n.1 (D.N.J. 2015) (finding that parents' "allegations suggest satisfaction of both statutory prerequisites for coverage under the IDEA" when the student had an "alleged need for help maintaining concentration, additional time to complete assignments, assistance to improve her organizational skills, and a special system to track her homework assignments plausibly constitutes 'special education and related services' under the IDEA."); *Jana K. ex rel. Tim K. v. Annville-Cleona Sch. Dist.*, 39 F. Supp. 3d 584, 589, 601-04 (M.D. Pa. 2014) (finding that the school failed to identify the plaintiff as a student with an emotional disability even though she exhibited emotional disturbance at school, including signs of depression, frequent visits to the school nurse, signs of self-injurious behavior, verbalized desire to commit suicide, and declining academic performance); *Lauren P. v. Wissahickon Sch. Dist.*, 310 Fed.Appx. 552, 554-55 (3d Cir.2009) (finding that student suffering from ADD, anxiety, depression, and learning disabilities was eligible for FAPE under IDEA, and that school district's "failure to address [the child's] behavioral problems in a systematic and consistent way denied [her] a FAPE"); *A.D. v. Haddon Heights Bd. of Educ.*, 90 F. Supp. 3d 326, 337 and 337 n. 11 (D.N.J. 2015) (noting that asthma may qualify as a disability under IDEA and that the student's "asserted need for special scheduling and/or home instruction clearly satisfies this minimal standard

[under IDEA]"), *judgment vacated and remanded on other grounds sub nom S.D. ex rel. A.D. v. Haddon Heights Bd. of Educ.*, 137 S. Ct. 2121, 198 L. Ed. 2d 193 (2017).

The District does not dispute that behavior-related diagnoses, such as TD's conversion or anxiety disorders, may constitute a disability, but suggests that disability alone is not sufficient for *eligibility* under either statute, since TD's academic performance was not substantially impacted. *See, e.g.,* Doc. 75 (Oral Arg. Tr.) at 16-18 ("The Court: I'm sorry, did you say the district does not dispute that he had a conversion disorder? Mr. Freund: I don't – no, I don't think it does....Now, we don't dispute that there was a conversion reaction, we don't know if it's a conversion reaction, we're not psychiatrists. That's what our position is."). In their Objections, the District claims that "[t]he R&R repeats the frequent but incorrect assumption that 'disability' equals 'eligibility,'" and that "[m]issing from the R&R is any discussion or analysis as to whether or how T.D.'s disability substantially limited an important life activity or in what way he was denied an educational benefit." Doc. 74 at 14-15 (emphasis in original). The District argues that to be eligible for Section 504, the student must have a disability that "substantially impact[s] a major life activity," and that similarly, to be eligible under IDEA, the "student must both have one of the educational disabilities specified by the law and *also be in need of specially designed instruction.*" Doc. 79 at 15 (emphasis added). In other words, instead of disputing the fact that TD suffered from conversion and anxiety disorders, the District seeks to minimize their impact on TD's education. They do so by arguing that TD did not require special education

34

classes and that in fact, he performed well academically. *See, e.g., id.* at 21-22 (arguing that "both the Decision and the R&R do not sort and separate what belongs to disability and what does not... the testimony and evidence of the educational professionals in this matter indicates that many of TD's behaviors were simply those of an eight year old little boy. And a happy, social and academically performing little boy."); Doc. 75 (Oral Arg. Tr.) at 6, 14 (emphasizing that TD performed well academically as evidence that his education was not adversely impacted); Doc. 43 at 34 (the District's brief on its motion for judgment on the administrative record arguing that "[o]f greater significance is that the Decision is reprehensively silent on the significant testimony and evidence at hearing of this Student's exemplary report cards and his outstanding performance on the PSSAs").

The Court takes the District's point that TD performed well academically at school and did not require special education. However, the Court declines to adopt the District's implied position that academic progress alone can negate eligibility for federal statutes designed to protect students with disabilities, especially when the record reveals various behavioral and social problems as a result of his diagnosed disorders. "There is no precise standard for determining whether a student is in need of special education, and well-settled precedent counsels against invoking any bright-line rules for making such a determination." *W. Chester Area Sch. Dist. v. Bruce C.*, 194 F.Supp.2d 417, 420 (E.D.Pa.2002) (citing *Ridgewood*, 172 F.3d at 247). Courts in this Circuit have cautioned against focusing on the student's academic progress to the detriment of ignoring their behavioral issues. *See, e.g.,*

*Lauren G. v. W. Chester Area Sch. Dist.*, 906 F. Supp. 2d 375, 389 (E.D. Pa. 2012) (noting that the school district erred by "only review[ing] academic records, student meetings, and written feedback provided by Lauren's teachers" and that the district "ignored Lauren's psychiatric diagnoses, her inpatient and outpatient psychiatric hospitalization, and the fact that she was cutting classes to see the guidance or crisis counselor once or twice a week."); *Bruce C.*, 194 F.Supp.2d at 420-21 (finding a child with ADD to be eligible under IDEA and concluding that "as a matter of law the [Pennsylvania Special Education] Appeals Panel erred in focusing on Chad's grades while disregarding Chad's potential...in light of the totality of the evidence, including the extensive amount of time Chad spent out of class receiving remedial and supplement assistance from his mother and Chad's potential as evinced by the District's testing, I conclude Chad is entitled to an IEP [under IDEA]"); *G.D.*, 832 F. Supp. 2d at 466–67 ("the fact that Jack was able to achieve academically should have been measured in light of his considerable intellectual potential...the District had an obligation to look beyond simply Jack's cognitive potential or academic progress and to address the attentional issues and behaviors that [child's teacher] had identified as impeding his progress.") (internal citations omitted); *G.H.*, 2013 WL 2156011, at *6 ("In deciding whether behavior at home impacted educational ability, courts have considered the following factors: 1) grades; 2) assessment results; 3) testimony of mental health professionals on the severity of the emotional disturbance; 4) testimony of educators and mental health professionals on whether special education services were needed; 5) whether

therapy focused on issues at home or at school; and 6) school attendance.") (collecting cases).

The Court is mindful that a violation of Section 504 is not "a *per se* violation" of IDEA, or vice versa. *Andrew M.*, 490 F.3d at 349. A plaintiff must still prove the elements under each statute, though they may rely on the same facts in doing so. *Id.* However, the Court finds that the Hearing Officer's legal conclusions that TD is simultaneously disabled under Section 504 and not disabled under IDEA to be unsupported by the Hearing Officer's own factual findings. It is well-established that IDEA and Section 504 claims can be based on the same facts, especially in the context of determining whether the student was deprived of FAPE. *See, e.g., id.* at 349 ("a party may use the same conduct as the basis for claims under both the IDEA and [Section 504] of the RA"); *Sher v. Upper Moreland Twp. Sch. Dist.*, 481 F. App'x 762, 764 (3d Cir. 2012) ("We agree with the District Court that, to the extent that the Shers sought relief under § 504 for the failure to provide a FAPE, the requirements of § 504, and any remedies available under that law, were coextensive with the IDEA.").

As discussed above, the Hearing Officer credited Dr. Hoover's diagnoses of conversion and anxiety disorders after evaluating TD. *Id.* ¶¶ 60, 62, 81. He also found that TD suffered from many behavioral and social problems at school, including vision problems, frequent nurse visits, an altercation with other students, assignment incompletion, and disrespectful behavior towards his fourth grade teacher. Fact Findings ¶¶ 51-58. Many of these problems were recurring issues, which presumably resulted in significant lost

37

instructional time for TD. *See id.* ¶ 64 (noting that at least one of TD's teachers indicated concern for TD's "absences from school" and stated that he "misses class time and needs to make up work") (quoting P-18).

The Hearing Officer also credited TD's independent evaluator's view that "in his opinion, the student was inappropriately touched in December 2011 and as reported to the District in January 2012" and that TD had conversion and anxiety disorders. Fact Finding ¶¶ 130, 133. The evaluator concluded that TD at least qualified for accommodations under Section 504 due to these disorders. *Id.* ¶ 130 (citing P-69 at 33). In fact, after the independent evaluator issued these findings, the District did offer Section 504 accommodations for TD, including a transition plan for re-enrollment in the district, weekly check-ins with a guidance counselor, frequent breaks and prompting to assist in maintaining focus, an agenda planner, preferential seating to minimize auditory and visual distractions, and extra time to complete tests and assignments. Doc. 14-5 at 17-18.

Based on these circumstances, the Hearing Officer found that TD was disabled under Section 504 and was entitled to FAPE. The same factual findings also support a finding of "emotional disturbance" disability under IDEA, which offers its protections to students with behavioral and emotional issues. Thus, the Court will vacate the Hearing Officer's legal conclusion that TD was not disabled under IDEA, and find that TD is equally entitled to FAPE under IDEA as well as Section 504.

## C. The Award for Tuition Reimbursement, While Not Warranted Under the Section 504 Claim Without A Showing of Deliberate Indifference, Will Be Upheld As An Available Remedy Under IDEA

Because the Court finds that TD had an eligible disability under IDEA and was denied FAPE for that disability, TD is separately entitled to tuition reimbursement despite the lack of deliberate difference on the part of the District. While compensatory damages require a finding of deliberate difference under Section 504, there is no such requirement under IDEA. *S.H.*, 729 F.3d at 263-64 (holding that intentional discrimination, such as deliberate indifference, is required for a claim for compensatory damages under Section 504 and the ADA, without reference to similar damages under IDEA). In fact, IDEA explicitly provides for tuition reimbursement as a form of relief without referencing intentional discrimination or bad faith by the school.

> If the parents of a child with a disability, who previously received special education and related services under the authority of a public agency, enroll the child in a private elementary school or secondary school without the consent of or referral by the public agency, *a court or a hearing officer may require the agency to reimburse the parents for the cost of that enrollment if the court or hearing officer finds that the agency had not made a free appropriate public education available to the child* in a timely manner prior to that enrollment.

20 U.S.C. § 1412(a)(10)(C)(ii) (emphasis added). In *Forest Grove Sch. Dist. v. T.A.*, the Supreme Court considered the provision above and held that "IDEA authorizes reimbursement for the cost of private special-education services...regardless of whether the child previously received special education or related services through the public school." 557 U.S. 230, 247, 129 S. Ct. 2484, 2496, 174 L. Ed. 2d 168 (2009). The opinion made no

reference to requiring intentional conduct in considering the provision. In *Ferren C. v. Sch. Dist. of Philadelphia*, the Third Circuit cited *Forest Grove* and noted that it stood for the proposition that "private school reimbursement was appropriate relief under *equitable* principles pursuant to 20 U.S.C. § 1415(i)(2)(C)." 612 F.3d 712, 719 (3d Cir. 2010) (emphasis added). Again, no reference to intentional conduct was made in the opinion. Later, in *D.F. v. Collingswood Borough Bd. of Educ.*, a case that concerned IDEA but not Section 504, the Third Circuit stated that "a child's entitlement to FAPE is not 'abridged because the [school] district's behavior did not rise to the level of slothfulness or bad faith.'" 694 F.3d 488, 499 (3d Cir. 2012) (quoting *M.C. ex rel. J.C. v. Cent. Reg'l Sch. Dist.*, 81 F.3d 389, 397 (3d Cir.1996)).

In fact, *Kirsch*, the Third Circuit case that held that tuition reimbursement constituted compensatory damages under Section 504, contemplated reimbursement damages under IDEA as well. *Kirsch* stated that "[p]arents are entitled to reimbursement for private school tuition 'if a federal court concludes both that the public placement violated IDEA and the private school placement was proper under the act.'" *Kirsch*, 722 F. App'x at 223 (quoting *Forest Grove*, 557 U.S. at 246). The Court went on to hold that the parents were entitled to tuition reimbursement for the students' private schooling as well as payment for one-on-one aides for the students under IDEA, noting that parents are entitled to "restitution under the IDEA for out-of-pocket expenses that the school district 'should have paid all along and would have borne in the first instance had it developed a proper IEP.'" *Id.* at 226 (quoting

*Chambers ex rel. Chambers v. Sch. Dist. of Philadelphia Bd. of Educ.*, 587 F.3d 176, 184

(3d Cir. 2009)).

However, the Court observed that the same form of requested relief under Section

504 required an additional deliberate indifference finding:

> The relief Parents seek [in the Section 504 claim], tuition reimbursement, is
> identical to the relief they seek in their IDEA claim. Specifically, Parents
> argue that if they are not entitled to reimbursement for all of the twins'
> educational expenses under the IDEA, they are entitled to full reimbursement
> under the ADA and Section 504... Parents contend that the District Court
> erred in applying the deliberate indifference standard to their ADA and
> Section 504 claims because their request for tuition reimbursement under
> those statutes is not a request for compensatory damages but, rather, is a
> request for equitable relief. However, Parents fail to articulate
> why reimbursement for money they have paid constitutes equitable relief
> rather than compensatory damages. In essence, tuition reimbursement
> compensates parents for education expenses. Thus it is properly classified
> as compensatory damage relief. Consequently, we conclude that the District
> Court did not err as a matter of law in applying the intentional discrimination
> standard to the ADA and Section 504 claims.

*Id.* at 227-28. Thus, a court may award tuition reimbursement as expressly

contemplated by IDEA's statutory text, whereas such relief would be properly categorized

as "compensatory damages" under Section 504, triggering a requirement for a deliberate

indifference showing. In the administrative proceeding, the Hearing Officer found that "the

independent evaluator testified credibly that the private placement was appropriate for the

student." Fact Finding ¶ 134. In addition, neither party has disputed that private placement

was appropriate for TD for his fifth and sixth grade years, i.e. the period for which the

Hearing Officer awarded reimbursement. Hearing Op. at 46. Because a finding of

deliberate indifference is not required under IDEA for tuition reimbursement, and because the Court finds that TD was denied FAPE under IDEA as well as Section 504 (*see* Section B *supra*), TD's parent is entitled to tuition reimbursement for his private placement as a result of the District's denial of FAPE. Thus, the tuition reimbursement award will be affirmed as modified, such that it will be granted on the basis of statutory provisions under IDEA, rather than on the basis of a deliberate indifference finding under Section 504.

### III. CONCLUSION

For the foregoing reasons, the Court will adopt the Magistrate Judge's Report and Recommendation in part and overrule it in part. A separate Order shall follow.

Robert D. Mariani
United States District Judge